UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| DONNA SHELDON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:04-cv-3-RLY-WGH |
| | ) | |
| WHIRLPOOL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT and
PLAINTIFF'S MOTION FOR ORAL ARGUMENT**

**I.    Introduction**

This matter is before the court on Defendant Whirlpool Corporation's Motion for Summary Judgment filed February 3, 2006.

**II.   Factual and Procedural Background**

The facts, as viewed in the light most favorable to Plaintiff, are as follows.

Defendant initially hired Plaintiff in 1978 as an hourly employee. (Deposition of Donna Sheldon ("Sheldon Dep.") at 12). In 1993, Whirlpool promoted Plaintiff to a supervisor. (*Id*. at 12). From 1993 until February 2004, Plaintiff was a supervisor in the Material Handling Department. (*Id*. at 17, 19-20). Plaintiff worked on the day shift from approximately August 2000 until the end of February 2004. (*Id*. at 34).

At all relevant times, from 2001 until her retirement on January 1, 2003, Wanda Whitt ("Whitt"), Lead Advisor in both the Material Handling and Receiving Departments,

supervised Plaintiff. (*See* Deposition of Wanda Whitt ("Whitt Dep.") at 5-7, 10; Sheldon Dep. at 29). Terry Hicks ("Hicks"), Material Engineer in the Material Handling Department, supervised Plaintiff from January 2003 until he went on a special assignment in May 2003. (Sheldon Dep. at 24; *see also* Deposition of Terry Hicks ("Hicks Dep.") at 5).

Bennett Gentry ("Gentry"), Business Unit Manager of the Material Handling Department, managed the entire department and was Whitt's and Hicks' direct supervisor. (Whitt Dep. at 8; *see also* Deposition of Bennett Gentry ("Gentry Dep.") at 6). While Hicks was on special assignment, Gentry assumed Hicks' responsibilities. (Sheldon Dep. at 24; Gentry Dep. at 10). One such duty was to directly supervise the Material Handling supervisors, including Plaintiff. (Sheldon Dep. at 24; Gentry Dep. at 10, 13-14).

The Material Handling Department is divided between the north and south ends of the plant, which is approximately a half mile apart. (Sheldon Dep. at 183). Overall, the major responsibilities of supervisors in the Material Handling Department include keeping a continuous flow of parts to the assembly line to avoid downtime, to adhere to the union contract, to remove all trash and salvage from the plant and to work as a team. (Whitt Dep. at 17; *see also* Deposition of Deborah Castrale ("Castrale Dep.") at 18).

At all relevant times, Plaintiff supervised the steel receiving area of the Material Handling Department. (Whitt Dep. at 25; Sheldon Dep. at 32). As a supervisor in the steel receiving area, Plaintiff was required to supervise employees unloading coils of steel off the trailers, placing the steel coils in the appropriate locations, and ensuring parts made it to the assembly line. (Sheldon Dep. at 28-31; Whitt Dep. at 25-26). Plaintiff was also required to ensure material was brought to the line in a timely manner without causing "lost space."

(Sheldon Dep. at 28). A "lost space" is whenever the production line stops running because a part or material has not made it to the line to be put on the refrigerator. (Sheldon Dep. at 29).

Each year, supervisors are evaluated on their performance by their manager. (Gentry Dep. at 17). However, every evaluation is reviewed by a group of managers to ensure consistency with the evaluations across the Division. (*Id*. at 17-19). Whirlpool also has a reduction in force policy. (Castrale Dep. at 18; *see also* Declaration of Deborah Castrale "Castrale Dec.") ¶ 2). Under the policy, the employees that would be impacted in a reduction in force are selected according to the lowest performance ratings from the previous years. (Castrale Dep. at 18-19; Castrale Dec. ¶ 2).

    A.    **Plaintiff's 2001 Calendar Year Performance Review**

For the 2001 calendar year, Plaintiff received an overall "Below Expectations" rating. (Sheldon Dep. Ex. 4). Plaintiff had missed seven months of work during 2001 (from April until November) due to a surgical procedure and related depression (Sheldon Dep. at 49-51), and according to Defendant, her evaluation was, therefore, only based on the five months of 2001 that she was not on leave. (Gentry Dep. at 30).

On February 4, 2002, Whitt met with Plaintiff to discuss her 2001 performance review. (Sheldon Dep. at 61, 65).[1] However, as soon as Plaintiff learned that her performance rating was "Below Expectations" for the year, Plaintiff became irate and refused to allow Whitt to discuss her rating. (Sheldon Dep. at 84; Sheldon Dep. Ex. 7). As such, the meeting only lasted ten minutes; Plaintiff continually interrupted Whitt and refused to listen to Whitt's

---

[1]Because Plaintiff was on a leave of absence from April until November 2001, Plaintiff's rating was based upon her performance from January until April and November through December of that year. (Whitt Dep. 55-56).

assessment of her performance. (Sheldon Dep. at 85; Whitt Dep. at 87). Ultimately, Plaintiff stormed out of the meeting with Whitt and refused to sign the performance review. (Sheldon Dep. at 89).

Soon thereafter, Gentry met with Plaintiff to go over her 2001 performance review. (Sheldon Dep. at 61). During the meeting, Gentry stressed to Plaintiff that he and Whitt believed there were several areas in her performance upon which she needed to improve. (*Id*. at 92; Gentry Dep. at 55-56; Gentry Dep. Ex. 8). On February 5, 2002, Plaintiff requested that Gentry identify in writing the areas upon which she needed to improve. (Sheldon Dep. at 92-93; Sheldon Dep. Ex. 8). In response, Gentry provided Plaintiff with a detailed email explaining the six areas in which Plaintiff needed to improve her performance. (Sheldon Dep. Ex. 8). Specifically, Gentry counseled Plaintiff that she needed to improve: (1) her understanding of what a supervisor's priorities are and work toward implementing those priorities; (2) her communication with her peers; (3) her ability to resolve problems; (4) her knowledge of the contract; (5) her accessibility by radio to other supervisors and employees; and (6) her attendance.[2] (Sheldon Dep. Ex. 8). Plaintiff does not dispute that both Whitt and Gentry honestly believed that she needed to improve her performance in these six areas. (Sheldon Dep. at 89, 93-94; Sheldon Dep. Ex. 4).

Because Plaintiff received a "Below Expectations" rating for 2001, in accordance with Defendant's policy, Plaintiff did not receive a raise and her bonus was reduced. (Sheldon

---

[2]During the five months that Plaintiff was not on leave throughout 2001, she still missed nine-and-a-half days of work that were unexcused absences not covered by leave. (Sheldon Dep. at 54). The court notes that, in a five month period, nine-and-a-half unexcused absences would constitute approximately one missed day of work every two weeks.

Dep. at 77). Plaintiff is unaware of any male supervisors who received a "Below Expectations" rating for 2001 but did receive a raise or a higher bonus. (*Id*. at 78). Plaintiff acknowledges that Defendant followed its policy regarding pay raises and bonuses for supervisors who received Below Expectations ratings. (*Id*.)

### B.     Plaintiff's 2002 Calendar Year Performance Review

Plaintiff again was required to take FMLA leave in 2002. Donna Sheldon Declaration ("Sheldon Dec." ¶ 27). Plaintiff missed work on FMLA leave from November 12 to November 25, 2002, and December 12, 2002, to January 2, 2003. (*Id*.)

In 2003, based on her performance during the 2002 calendar year, Plaintiff received a "Meets Expectations" performance review. (Sheldon Dep. at 107; Sheldon Dep. Ex. 9). Although there were areas of improvement from 2001, Plaintiff's 2002 performance review recognized that she still needed to make improvements in four of the six areas about which Gentry had previously counseled her in February 2002. (Sheldon Dep. Ex. 9). Specifically, Plaintiff's 2002 performance review noted that she continued to need to improve her teamwork skills, increase her knowledge of the contract, work on treating all employees fairly, and continued to miss too much work which hampered her ability to meet objectives.[3] (*Id*.) Regardless of these deficiencies, in accordance with Whirlpool's policies, Plaintiff received both a raise and a bonus. (Sheldon Dep. at 118).

---

[3] In 2002, Plaintiff missed approximately 15 days of work that were non-leave, unexcused absences. (Sheldon Dep. at 110). The court again notes that, when factoring in the amount of FMLA leave that Plaintiff took, she missed 15 days of work during an 11-month time span which amounts to nearly one unexcused absence every three weeks.

### C. Proceedings Before the EEOC in 2003

After receiving the "Below Expectations" review in 2001 and the "Meets Expectations" review in 2002, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC charge"). Plaintiff's EEOC charge was filed on May 16, 2003, and reads as follows:

> 1. [Plaintiff], a female, has worked for [defendant] since approximately April 8, 1991. During that time, [plaintiff] has risen to her current position of Supervisor.
> 2. Throughout her employment with [defendant], [plaintiff] has met or exceeded all legitimate expectations of performance.
> 3. In or about April 2001, [plaintiff] underwent a surgical procedure for a serious health condition that required her to miss work for an extended period of time.
> 4. In or about February 2002, [plaintiff] received an unfavorable performance review for the calendar year 2001 which resulted in a "Below Expectations" rating. Additionally, [plaintiff] did not receive a pay raise and had her bonus decreased as a result of her performance review.
> 5. During November and December 2002, [plaintiff] was forced to miss approximately twenty-one (21) days of work due to a serious health condition.
> 6. In or about February 2003, [plaintiff] received a performance review for the calendar year 2002 which stated that "[plaintiff] continues to miss too much work, which hampers her ability to meet objectives."
> 7. Similarly-situated male employees have not been similarly treated. For example, Marty Sweat, male, and Terry English, male, missed numerous work days during the calendar year 2002, however, they were not cited by [defendant] for missing too much work.
> 8. [Defendant's] actions have created, and continue to create, a hostile work environment on the basis of [plaintiff's] sex, female.
> 9. [Defendant's] actions were and continue to be intentional, willful, and in reckless disregard for [plaintiff's] rights protected by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e.
> 10. [Plaintiff] has suffered, and continues to suffer, damages as a result of [defendant's] unlawful actions.
> 11. [Plaintiff] notes that these facts are not exhaustive and she has not had the opportunity to review documents or converse with witnesses prior to the filing of this charge so as to refresh her memory as to additional evidence.

(Brief in Support of Motion for Summary Judgment at Ex. 2). The EEOC charge contains

several different boxes to be checked to signify the type of discrimination alleged, but in this instance it appears that only one box is marked for discrimination based on sex.  (*Id*.)

> **D.     Plaintiff's Work Performance in 2003**

After filing her EEOC charge, Plaintiff continued to work as a supervisor throughout 2003.  However, Plaintiff claims that after her EEOC charge was filed, Gentry retaliated against her by spending three weeks continuously watching over her every move and coming into her office throughout the day with his Palm Pilot.  (Sheldon Dep. at 170-172).  This three-week period allegedly took place from late June to early July.  (*Id*. at 169-171).  Plaintiff claims that Gentry had never closely monitored her before this point.  However, Plaintiff admits that Gentry only became her immediate supervisor in approximately May 2003 "after the first four months of the year," when Terry Hicks went on special assignment.  (*Id*. at 24).

Also, sometime in June (around Father's Day) Plaintiff fell and hit her head while shopping.  (Sheldon Dep. at 186).  After Plaintiff hit her head, for a three-week to five-week period of time in June and July, she began experiencing mental problems to the extent that she felt her "personality was changing."  (*Id*. at 186-187).  Beginning on approximately July 21, 2003, and continuing until October 31, 2003, Plaintiff was placed on leave by her doctor and took another 15-week leave of absence.  (*Id*. at 169, 186).  Plaintiff explained that her doctor initially thought she was suffering from depression so his original rationale for placing her on leave was depression.  (*Id*. at 186).  According to Plaintiff, Defendant considered her doctor's original diagnosis "vague," and ordered her to see another psychologist.  (Sheldon Dep. at 187-188).  The new psychologist that Plaintiff saw provided a new diagnosis of post-concussion syndrome and eventually instructed Plaintiff that she would have a return-to-work

date of November 1, 2003. (*Id*.) Plaintiff claims that she continued to see another psychologist, Dr. Lawrence Katz, who instructed her that she should not return to work on November 1. (*Id*.) Despite some reservations about returning to work, Plaintiff did, in fact, return to work on November 1, 2003. (*Id*. at 185-190).

### E. Plaintiff's 2003 Calendar Year Performance Review

In 2004, based on her 2003 calendar year performance, Plaintiff again received a "Below Expectations" performance review.[4] (Sheldon Dep. at 132; Sheldon Dep. Ex. 10). Because of her "Below Expectations" rating, Plaintiff did not receive a bonus for the 2003 calendar year. (Sheldon Dep. at 166). Plaintiff admits that this is consistent with Whirlpool's policy at the time. (*Id*.) Furthermore, Plaintiff admits that she is unaware of any other supervisor who received a "Below Expectations" rating and received a pay increase or bonus. (*Id*. at 192). Plaintiff acknowledges that Gentry revisited the same six areas on which he had previously counseled her and felt that she needed to improve. (*Id*. at 133; Sheldon. Dep. Ex. 11). It is undisputed that Gentry honestly believed Plaintiff needed improvement in these six areas. (Sheldon Dep. at 134).

Overall, Gentry believed there were several examples of why Plaintiff received a "Below Expectations" rating for 2003. (Sheldon Dep. 154; Sheldon Dep. Ex. 11). Specifically, Gentry assigned Plaintiff a project known as the ASN barcode project which required that Plaintiff work on eliminating printing barcode tickets on incoming steel. (*Id.*) The next day, Plaintiff contacted Gentry and said she had resolved the problem. (Sheldon

---

[4]Plaintiff's evaluation for the 2003 calendar year, which eventually lead to her demotion, was preceded by both the EEOC charge (discussed above) and the filing of Plaintiff's Complaint in this case (discussed below).

- 8 -

Dep. at 154; Sheldon Dep. Ex. 11; Gentry Dep. at 76). However, after talking with Plaintiff, Gentry realized that she had failed to consider several areas that would impact her resolution. (Sheldon Dep. at 154; Sheldon Dep. Ex. 11). Although Gentry asked Plaintiff to follow up with those issues, Plaintiff failed to do so. (*Id*.) Plaintiff claims that she worked very hard on the ASN barcode project and that it still had not been completed as of the date of her Response to the Motion for Summary Judgment. (Sheldon Dec. ¶ 23; Response to Defendant's Motion for Summary Judgment at 5).

Additionally, Gentry received feedback that Plaintiff was difficult to work with and failed to communicate with her peers on manpower issues, including scheduling vacations and loaning out employees to other areas of the department. (Sheldon Dep. at 155; Sheldon Dep. Ex. 11). Also, in July 2003, Defendant alleges that Plaintiff supervised employees who overloaded a crane creating a significant safety concern in the plant. (Sheldon Dep. at 157; Sheldon Dep. Ex. 11). When the crane incident occurred, Defendant alleges that Plaintiff claimed to Gentry that she did not know the capacity of the crane, despite the fact that it was stamped in large letters on its side. (*Id*.) Plaintiff disputes Defendant's characterization of the crane incident. (Sheldon Dep. at 129-131).

Gentry additionally felt Plaintiff's performance fell "Below Expectations" because of Plaintiff's failure to cover another supervisor's area while that supervisor was off work. (Sheldon Dep. at 158). Defendant believes this was a reasonable request in light of the fact that that same supervisor had covered Plaintiff's area when Plaintiff was off work. (*Id*.; Sheldon Dep. Ex. 11). Defendant contends that although Plaintiff hesitantly agreed to cover the area, she failed to do so leaving the hourly employees to supervise themselves. (Sheldon

Dep. Ex. 11).

Finally, Gentry believed Plaintiff's knowledge of the contract was "Below Expectations." (Sheldon Dep. Ex. 11). For instance, in July 2003 Plaintiff improperly disqualified an employee from a job. (*Id*.) Because Plaintiff should not have disqualified this employee, Gentry had to put him back on the job. (*Id*.) Furthermore, Plaintiff gave an employee overtime that, based upon seniority, belonged to another employee. (*Id*.) Because of this contractual error, Defendant was forced to pay both employees the overtime. (*Id*.)

### F.  The Elimination of Plaintiff's Position in 2004

Upon the completion of Plaintiff's 2003 performance review, Gentry attempted to explain to her that, because of budget constraints, four supervisor positions were being eliminated. (Sheldon Dep. at 140). Because of Plaintiff's performance rating, her position was one that was to be eliminated. (*Id*.) Beyond Plaintiff's position, three other male supervisor positions were eliminated. (*Id*. at 142). Beginning in March 2004, Plaintiff became an hourly employee again and returned to the hourly workforce. (*Id*. at 139-140). To date, Plaintiff continues to work for Defendant. (*Id*. at 193).

### G.  The Filing of Plaintiff's Second EEOC Charge

After Plaintiff received her demotion, she filed a new EEOC charge. (Brief in Support of Defendant's Motion for Summary Judgment at Ex. 2). The new EEOC charge noted that she had filed a previous EEOC charge and lawsuit claiming sex-based discrimination. (*Id*.) In the new EEOC charge, Plaintiff claimed that her demotion was a result of her prior EEOC charge and lawsuit, and that similarly situated individuals, who worked for Defendant but had not filed complaints, were treated more favorably than Plaintiff. (*Id*.)

### H.     The Filing of the Lawsuit

Plaintiff filed her Amended Complaint and Demand for Jury Trial on February 3, 2006.[5]  In her Amended Complaint, Plaintiff alleged that she was the victim of sex-based discrimination.  (Complaint ¶ 18).  Plaintiff also alleged retaliation in violation of the Family Medical Leave Act ("FMLA") and interference with her rights under the Employee Retirement Income Security Act ("ERISA").  (*Id*. ¶¶ 31-38).  Finally, Plaintiff alleged retaliation for filing her EEOC charge and Complaint.  (*Id*. ¶¶ 20-23).  Plaintiff's allegations stem from the following incidents:  (1) Plaintiff claims that her 2002 performance review amounted to sex discrimination under Title VII because the review pointed out that she missed too much work while other male employees who missed similar amounts of work did not receive similar reviews (Sheldon Dep. at 102, 111, 115); (2) Plaintiff brought her FMLA claim alleging that her "Below Expectations" rating in 2001 was in retaliation for taking FMLA leave (Sheldon Dep. at 190); (3) Plaintiff brought her ERISA claim because she did not receive a pay raise and received a reduced bonus in 2002, and because she was demoted and did not receive a bonus in 2004 (Sheldon Dep. at 191); and (4) Plaintiff's Title VII retaliation claim stems from her demotion from a salary to an hourly position which she claims was a result of filing an EEOC charge and lawsuit.  (Sheldon Dep. at 41-42; Sheldon Dep. Ex. 3).

Defendant seeks summary judgment on all of Plaintiff's claims.  First, Defendant

---

[5]Plaintiff's original Complaint was filed on January 6, 2004, and only addressed the events arising out of her employment evaluations from 2001 and 2002.  After her "Below Expectations" evaluation from 2003 and her demotion, Plaintiff filed a Motion to Stay on August 6, 2004, so that she could file a new EEOC charge.  Plaintiff eventually filed her Amended Complaint adding the new charge of retaliation.

argues that Plaintiff's Title VII claims based on incidents prior to July 20, 2002, must be dismissed because they were untimely filed. Defendant's second contention is that Plaintiff's Title VII claims of retaliation and sex discrimination must be dismissed because Plaintiff can not prove her prima facie case and because she cites no evidence of pretext. Third, Defendant argues that Plaintiff's Title VII claims surrounding her performance evaluations must fail because they do not constitute materially adverse employment action. Defendant's final argument raised in its Motion for Summary Judgment is that Plaintiff's ERISA and FMLA claims both fail as a matter of law. Defendant makes an additional argument in its Reply claiming that Plaintiff failed to address, and has therefore abandoned, her ERISA and sex-based discrimination claims. For several reasons, the court agrees and, therefore, concludes that Defendant is entitled to judgment as a matter of law on all of Plaintiff's claims.

### III.    Legal Standard

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The motion should be granted so long as no rational fact finder could return a verdict in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Thus, a court's ruling on a motion for summary judgment is akin to that of a directed verdict, as the question essentially for the court in both is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-252.

When ruling on the motion, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences therefrom in that party's favor. *Id.* at 255. If the nonmoving party bears the burden of proof on an issue at trial, that party "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *see also Silk v. City of Chicago,* 194 F.3d 788, 798 (7th Cir. 1999). Lastly, the moving party need not positively disprove the nonmovant's case; rather, it may prevail by establishing the lack of evidentiary support for that case. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

**IV.   Analysis**

Plaintiff brought her claims alleging violations of (1) Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*; (2) the FMLA; and (3) ERISA.

### A.   Plaintiff Abandoned Her ERISA Claim and Title VII Sex Discrimination Claim

Plaintiff's Amended Complaint alleges discrimination based on Plaintiff's sex as well as a violation of ERISA. However, Defendant sought dismissal of these claims in its Motion for Summary Judgment, and Plaintiff's Response contained no arguments that these claims should survive summary judgment. Additionally, the court has been presented with no evidence that Plaintiff was treated differently because she is a female. Nor has the court seen any evidence supporting Plaintiff's ERISA claim. Therefore, because Plaintiff has abandoned these claims, the court concludes that Defendant's Motion for Summary Judgment is **GRANTED,** and these claims are **DISMISSED.**

### B.      Plaintiff's Remaining Title VII Claim Alleging Retaliation

In her Amended Complaint, Plaintiff also argues that Defendant retaliated against her after she brought a claim of sex discrimination in her EEOC charge.  Under Title VII it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2.  While Title VII protects against discrimination, it also provides a safeguard for individuals who are retaliated against for raising claims of discrimination.

A plaintiff attempting to demonstrate retaliation may do so by way of the direct or indirect method.  *See Culver v. Gorman & Co.,* 416 F.3d 540, 545-46 (7th Cir. 2005).  As is the case here, where Plaintiff does not purport to argue that there is direct evidence of retaliation, the court must examine Plaintiff's claim using the burden-shifting method set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  Under the *McDonnell-Douglas* framework, Plaintiff must first establish her prima facie case.  *Pafford v. Herman,* 148 F.3d 658, 665 (7th Cir. 1998).  Once she has carried her burden of demonstrating a prima facie case, there is a presumption of retaliation, and the burden shifts to Defendant who must prove by a preponderance of the evidence that the same employment action would have occurred even in the absence of Plaintiff's protected conduct.  *Culver,* 416 F.3d at 546.  If the employer provides such a reason, the burden then shifts back to the

employee to prove that the employer's stated reason is a mere pretext.[6]  *Vakharia,* 190 F.3d at 806-07.

In order to make out a prima facie case of retaliation, Plaintiff must show that:  (1) she engaged in a statutorily protected activity; (2) she was performing her job satisfactorily; (3) she suffered an adverse employment action; and (4) Defendant treated similarly situated employees who did not engage in the statutorily protected activity more favorably.  *Hilt-Dyson v. City of Chicago,* 282 F.3d 456, 465 (7th Cir. 2002).

In this instance, there is no dispute that Plaintiff engaged in protected activity or that she suffered an adverse employment action.  Plaintiff clearly had already filed her EEOC charge and this lawsuit before her demotion.  Filing an EEOC charge and lawsuit are protected activities and the demotion is an adverse employment action.  Hence, Plaintiff has satisfied the first two prongs of her prima facie case.

However, Plaintiff has failed to demonstrate that she was performing her job satisfactorily, and she has, therefore, failed to satisfy her prima facie case.  As discussed in great detail above, Plaintiff's supervisor, Bennett Gentry, evaluated Plaintiff negatively on three occasions:  (1) Plaintiff's "Below Expectations" evaluation in 2002 that discussed six areas that Plaintiff had struggled with during the 2001 calendar year; (2) Plaintiff's "Meets Expectations" evaluation in 2003 that listed four of the previous six areas where Plaintiff still fell short during the 2002 calendar year; and (3) Plaintiff's 2004 "Below Expectations" evaluation which revisited the same six areas and concluded that, during the 2003 calendar

---

[6]The Seventh Circuit has determined that pretext means a phony reason for the employer's actions.  *See Jackson v. E.J. Brach Corp.,* 176 F.3d 971, 983 (7th Cir. 1999).

- 15 -

year, Plaintiff fell short in the same six areas as 2001.

This court concludes that these areas of evaluation are perfectly legitimate expectations to be placed on a supervisor at a company such as Whirlpool. During 2001 and 2002, even during the time that Plaintiff was not on approved leave, she missed work, on average, nearly once every three weeks. Certainly it is reasonable for an employer such as Defendant to expect its supervisors to avoid such an enormous number of unexcused absences. It is also reasonable to expect a supervisor to have a working knowledge of the employment contract so that mistakes such as improperly disqualifying an employee from a job or giving overtime to the wrong person do not occur. Finally, it is reasonable to expect a supervisor to demonstrate sound communication skills and be accessible to other employees.

Plaintiff has not provided any evidence that Gentry's three evaluations of Plaintiff did not take place. Nor has Plaintiff demonstrated that Gentry did not honestly believe that she fell below his expectations in these areas.[7] Instead, Plaintiff has provided her own self-serving assessment of her performance. However, "an employee's self-serving statements about [her] ability are insufficient to contradict an employer's negative evaluation and do not create a material dispute about the employer's honesty or establish pretext." *Fortier v. Ameritech Mobile Commc'ns, Inc.,* 99 F.3d 1106, 1114 (7th Cir. 1998)(internal citations and quotations omitted). Plaintiff has, therefore, failed to demonstrate her prima facie case because she cannot show that she was performing her job satisfactorily, and her Title VII

---

[7] It is important to note that the court does not sit as a "super-personnel review board" second guessing all of an employer's facially legitimate business decisions. Thus, Defendant's "actions can be 'foolish or trivial or even baseless' so long as it 'honestly believed' the proffered reasons for the adverse employment action." *Culver,* 416 F.3d at 547 (quoting *Hartley v. Wisconsin Bell, Inc.,* 124 F.3d 887, 890 (7th Cir. 1997)).

retaliation claim is **DISMISSED.**

### C. Plaintiff's FMLA Retaliation Claim

Plaintiff's final argument in her Amended Complaint is that Defendant's "Below Expectations" evaluation for the 2001 calendar year was given in retaliation for her use of FMLA leave during 2001. An FMLA retaliation claim is evaluated in the same way as other employment-related retaliation claims such as those under Title VII; Plaintiff must prove retaliation by either the direct or indirect method. *Buie v. Quad/Graphics, Inc.,* 366 F.3d 496, 503 (7th Cir. 2004). As Plaintiff has no direct evidence of FMLA retaliation, she must use the indirect method to prove retaliation. Hence, she must first prove her prima facie case, and

> [t]o establish a prima facie case, a plaintiff must show that after engaging in protected conduct only [she], and not any similarly situated employee who did not engage in protected conduct, was subjected to an adverse employment action even though [she] was performing [her] job in a satisfactory manner. If the defendant presents no evidence in response, the plaintiff is entitled to summary judgment. If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, he is entitled to summary judgment. Otherwise there must be a trial.

*Id.*

In this case, because Plaintiff took FMLA leave during 2001, she can demonstrate that she engaged in protected activity. And, while Defendant argues that Plaintiff did not sustain an adverse employment action when she received no raise and a reduced bonus, the Seventh Circuit has indicated that denial of a raise does constitute an adverse employment action. *Farrell v. Butler Univ.,* 421 F.3d 609, 614 (7th Cir. 2005). However, as in the discussion above concerning Plaintiff's Title VII retaliation claim, Plaintiff again cannot show that she was performing her job satisfactorily. Gentry provided six areas where Plaintiff fell below

expectations during 2001.  Plaintiff again has provided no evidence that suggests that Gentry did not honestly believe that Plaintiff fell below expectations in these areas.  And this court will not examine whether Gentry's reasons were "foolish or trivial or even baseless."  *Culver,* 416 F.3d at 547.  Thus, Plaintiff has failed to demonstrate a prima facie case of FMLA retaliation, and Defendant's Motion for Summary Judgment must be **GRANTED.**

### V.   Plaintiff's Motion for Oral Argument

Plaintiff requests the court grant her oral argument on the Defendant's Motion for Summary Judgment.  As the court has found the Defendant's motion to be meritorious, Plaintiff's Motion for Oral Argument (Document # 62) is **DENIED** as **MOOT**.

### VI.   Conclusion

For the reasons outlined above, Defendant's Motion for Summary Judgment (Document # 58) is **GRANTED.**  Plaintiff's claims are **DISMISSED, with prejudice.**

   **SO ORDERED.**

Dated:  September 29, 2006.

_____
   RICHARD L. YOUNG, JUDGE
   United States District Court
   Southern District of Indiana


Electronic copies to:

Virginia M. O'Leary
O'LEARY & ASSOCIATES
oleary@gibsoncounty.net

Garrison L. Phillips
LITTLER MENDELSON, P.C.
gphillips@littler.com

Marissa Ross
LITTLER MENDELSON, P.C.
maross@littler.com